**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KARL L. WARREN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 1622** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Karl L. Warren seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion, denies Defendant's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on June 15, 2011, alleging disability since February 2, 2008 due to AIDS and depression. (R. 131, 161-162). It appears that he had received Social Security benefits for some period of time between 1993 and 2011, and that those benefits were terminated some time in 2011, prior to his current application. (R. 48, 158, 414, 483). The record does not provide the exact dates of his prior benefits or explain why they were terminated. The Social Security Administration denied his current application initially on October 4, 2011, and again upon reconsideration on

December 16, 2011.  (R. 68, 73).  Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Patrick Nagle (the "ALJ") on December 10, 2012.  The ALJ heard testimony from Plaintiff, who was represented by an attorney, and from vocational expert Thomas Dunleavy (the "VE").  (R. 22).  Shortly thereafter, on December 27, 2012, the ALJ found that Plaintiff is not disabled because he is capable of making a successful adjustment to unskilled light work that exists in significant numbers in the national economy.  (R. 22-32).  The Appeals Council denied Plaintiff's request for review on January 8, 2014, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  (R. 1-4).

In support of his request for remand, Plaintiff argues that the ALJ: (1) erred in assessing his credibility; and (2) failed to properly weight the medical opinions of record. As discussed below, the Court agrees that the ALJ has failed to provide adequate support for his credibility finding, and the case must therefore be remanded for further consideration of this issue.

## **BACKGROUND**

Plaintiff was born on November 22, 1968 and was 44 years old at the time of the ALJ's decision.  (R. 70).  He has training as a phlebotomist, and worked in that field in 1991-1992, 2002-2003, and from 2007 through early 2008.  (R. 46, 142-144, 168-171). Although he was not working at the time he filed his claim in 2011, he started another part-time phlebotomy position in June 2012, which continued at least through his hearing in December 2012. During that period, he was working fifteen hours a week on a rotating schedule of two weeks on and one week off, earning a gross income of approximately $800/month, excluding fringe benefits.  (R. 57, 146-156).

## A. Medical History

### 1. Background: HIV Status and Doctors

The available medical record dates from April 2007 to August 2012. A progress note dated April 29, 2008 contains portions of Plaintiff's earlier medical history. (R. 236). Per that note, Plaintiff was diagnosed with HIV on January 7, 1992, at age 23, and was treated with antiretroviral drugs including AZT. (*Id.*). From 1992 to 1995, his CD4 lymphocyte (T-cell) counts ranged between 240 and 437 cells per cubic liter.[1] (*Id.*). There are no medical records available for the period between 1995 and 2007. From 2008-2012, Plaintiff's T-cell counts were consistently above 500, which is within the reference range for healthy adults. (R. 294, 303, 314, 321, 335, 473, 566). Meanwhile, blood tests from 2007 to 2012 have consistently showed undetectable HIV viral RNA loads.[2] (R. 292, 297, 299, 305, 307, 313, 322, 324, 404, 473, 503, 517, 565).

Plaintiff's long-time primary care physician is Dr. Cherie Gilleon, DO, who over the years has treated him at various facilities, including Seton Family Health Center ("Seton"); Chicagoland Complete Health Care; and Midwest Family Health Center, which is part of Thorek Memorial Hospital ("Thorek"). Since 2004, he has also received treatment from Dr. Weinstein, MD, at Lakeshore Infectious Disease ("Lakeshore.") He

---

[1] CD4 count is an indicator of immune system function. The CD4 count of a healthy adult ranges from 500 to 1200; a count below 200 in a person living with HIV indicates that the disease has progressed to AIDS. (https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/, last visited August 24, 2015.)

[2] A viral load test measures the number of HIV particles in a milliliter of blood. The goal of anti-retroviral therapy in HIV patients is to move the viral load down, ideally to undetectable levels. (https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/, last visited August 24, 2015). An undetectable viral load does not mean that the virus is completely gone from the body, just that it is below what a lab test can find. (*Id.*)

has also seen other doctors, including Dr. Hames at Seton, Dr. Sein Khiong Yeo at Thorek, and colleagues of Dr. Weinstein at Lakeshore.[3]

### 2. 2007-2008

In April 2007, Plaintiff experienced chest congestion identified by doctors at Lakeshore as a potential case of pneumonia. (R. 276). Four months later, in August, he tested positive for a staph infection. (R. 339). He missed a scheduled appointment in October, then on December 20, 2007 again visited Lakeshore, this time reporting recent problems with night sweats, difficulty sleeping, fatigue which was described as "stable," a feeling of being "hot or flushed," and hyperhidrosis. (R. 271, 272). Plaintiff told the doctor that his excessive sweating was "again interfering at work – patients are complaining." (R. 271). The doctor recommended investigating the availability of Botox to treat the condition. (*Id.*). At that December 20 visit, his doctor also noted that Plaintiff had "excellent compliance with his HIV medications." (R. 271).

On February 14, 2008, Plaintiff visited Lakeshore, still complaining of hyperhidrosis, telling his doctor that he had always had increased sweating and had lost his job because of that. (R. 270). As noted earlier, Plaintiff alleges that his disability began on February 2, 2008. (R. 131). The doctor again suggested Botox therapy for hyperhidrosis. (*Id.*). In a patient questionnaire filled out that day, Plaintiff circled "yes" to indicate recent trouble with "back, bones, or joints," but did not specify details. (R. 267). On examination, Plaintiff had no cough, fever, or wheezing; he was compliant with his medications, which included the HIV drug Atripla; and he exhibited "excellent

---

[3]    The first name of Dr. Hames and the names of other Lakeshore physicians are illegible in the record.

viral suppression." (R. 270). He was also taking Prozac for depression and anxiety, and was "feeling well" in that regard. (*Id.*).

On his next visit to Lakeshore in April 2008, Plaintiff was still doing well on his HIV regimen, but continued to suffer from hyperhidrosis. Notes suggested that his primary care doctor could follow up regarding a compassionate use program for Botox. (R. 264).

On November 4, 2008, Plaintiff again visited Lakeshore. In a patient questionnaire, he reported feeling hot or flushed but indicated no other problems such as fatigue, difficulty staying awake, thrush or other mouth problems. (R. 258-261). Progress notes from that visit indicate that he was still doing well and taking his medication regularly. (R. 262).

### 3. 2009-2010

On February 13, 2009, Plaintiff had a rash on his hands and tested positive for syphilis, as shown by a rapid plasma reagin ("RPR") test reactive at a dilution of 1:128.[4] (R. 253). Dr. Gilleon reported the infection to Dr. Weinstein, and Plaintiff was treated with a course of penicillin injections. (*Id.*).

On July 17, 2009, Plaintiff went to the emergency room with a probable lung infection and was prescribed Zithromax. (R. 253). Four days later, he visited Lakeshore to follow up. Notes from Lakeshore indicate that he had experienced left side back pain, chest congestion, and a cough productive of green-gray sputum. (*Id.*).

---

[4] An RPR test screens for syphilis by detecting syphilis antibodies. (http://www.nlm.nih.gov/medlineplus/ency/article/003533.htm, last visited August 12, 2015). In patients with secondary or early latent syphilis, the RPR tests are invariably reactive, usually at a dilution of 1:32 or higher. (www.dshs.state.tx.us/hivstd/info/edmat/syphtest.pdf, last visited August 12, 2015).

The incident was diagnosed as "possible pneumonia vs tracheobronchitis in an immunocompromised patient," and he was given a nebulizer treatment. (R. 252-253). In a patient questionnaire completed during that same visit, Plaintiff newly reported ankle pain. (R. 254-257).

Plaintiff's August and October 2009 RPR tests indicated a drop in syphilis antibodies from his initial diagnosis in February. (R. 251). On October 29, 2009, Plaintiff again went to Lakeshore, reporting no new problems. (R. 247-250). Progress notes from that visit refer to his history of syphilis and hyperhidrosis, as well as a recent hospitalization for hidradenitis suppurativa, a skin infection, which was treated with Bactrim (an antibiotic), from which Plaintiff "developed an extensive rash within the 1st 2-3 days of treatment." (R. 251).

In November 2009, Plaintiff developed what he described as a "boil" on his back and was instructed to present to the emergency room for evaluation. (R. 246). He was admitted to Saint Joseph Hospital on November 9 with a skin infection in the scapular area. Though most of the notes about this hospital visit are not legible in the record, later notes refer to the infection as "left shoulder cellulitis (MRSA)." (R. 243, 244-245, 399). By his November 24, 2009 follow up appointment, Plaintiff had finished his course of antibiotics, the wound had healed, and no sign of infection remained. (R. 399).

On March 4, 2010, Plaintiff visited Lakeshore, where his doctor made note of his earlier hospitalization for a skin infection, again indicating that it had "resolved," and described his mood as "stable—not depressed." (R. 241).

On April 12, 2010, Plaintiff visited Dr. Gilleon and reported pain on the outside of his ankle, worsened by walking. (R. 397). He exhibited some tenderness on the ankle

but no gross deformity or swelling, and he had a normal range of motion. (*Id.*). Dr. Gilleon indicated the problem was likely caused by overuse and advised Plaintiff to buy shoes with better support. She also suggested that he treat the pain with rest, ice, compression, elevation, and ibuprofen. (R. 398). Plaintiff visited Seton again on June 23, 2010, this time seeing Dr. Hames, and reported "no physical complaints." (R. 395).

### 4. 2011

On January 3, 2011, Plaintiff visited Dr. Gilleon at her new offices at Chicagoland Complete Health Care ("Chicagoland Complete.") He reported that he was "doing well" and that his pain level was zero out of ten; however, he expressed concern for his partner, who was sick due to AIDS. (R. 379).

Plaintiff returned to Chicagoland Complete on March 16 and 17, 2011. On March 16, he reported that his pain level was six out of ten and stated that he was taking Vicodin for pain. (R. 371). The next day, he complained of increased fatigue and stress due to his partner's illness. (R. 376). He also reported having diarrhea four to five times a day for two weeks, but no fever, chills, nausea, or vomiting. (*Id.*). He reported that he had been spending time at Kindred[5] with his partner for a month and eating a "poor diet." He was given a vitamin B-12 injection. (*Id.*).

Two months later, on May 16, 2011, when Plaintiff again visited Chicago Complete Health Care, he was still taking Vicodin for pain. (R. 371). On May 18, 2011, Plaintiff visited Lakeshore. He was tolerating his medications "OK" and missing one

---

[5]    Kindred Hospital provides long-term acute care to medically complex patients, including those with infectious disease. (http://www.khchicagonorth.com/about-us/, last visited August 12, 2015.)

dose per month. He had no cough, sputum, or rash; his mood was stable; and he reported recent pain in his left rib. (R. 362).

On June 16, 2011, Dr. Gilleon filled out the first of her two reports on Plaintiff's HIV Infection for the Social Security Administration. (R. 349-352). There, she confirmed Plaintiff's HIV diagnosis and checked boxes indicating comorbid mycobacterial infection, syphilis, and candidiasis. She also wrote that Plaintiff had in a one-year period manifested diarrhea twice for one week each, pneumonia once for one week, and chronic hyperhidrosis. (R. 351). In handwritten remarks, she also made note of fatigue, nausea/vomiting, and a secondary syphilis infection. (*Id.*).

During a visit with Dr. Gilleon on July 8, 2011, Plaintiff reported depression over his partner's end stage AIDS, and increased pain. Dr. Gilleon's notes indicate that Plaintiff had stopped taking his medications consistently, and that he was crying. (R. 358-359). A physical examination indicated that his gait and range of motion were normal, and that the condition of his mouth was normal. (R. 359). Dr. Gilleon diagnosed "depression/grief" and prescribed the anxiety drug lorazepam as needed. In a follow-up visit one week later on July 16, Plaintiff's gait, range of motion, heart sounds, and respirations were normal, but he again reported feeling depressed due to his partner's illness and financial stressors. (R. 355). Dr. Gilleon again diagnosed depression and prescribed lorazepam, and also recommended counseling. (R. 357). Plaintiff's gait, range of motion, heart sounds, and respiration remained normal. (R. 356).

On August 10, 2011, Dr. Weinstein filled out a report on Plaintiff's HIV infection for the Disability Determination Services Office of the State of Illinois. (R. 408-410). Dr.

Weinstein indicated that he has been treating Plaintiff since 2004. (R. 408). He confirmed Plaintiff's HIV diagnosis but did not check boxes indicating the presence of mycobacterial infections, multiple or recurrent bacterial infections, fungal infections, protozoan or helminthic infections, viral infections, malignant neoplasms, chronic diarrhea, HIV encephalopathy, HIV wasting syndrome, or other infections. (R. 408-410). Under a section for conditions of the skin or mucus membranes, Dr. Weinstein noted that Plaintiff had a history of MRSA, which was resolved, and hyperhidrosis. (R. 410). He made no notes of other manifestations of HIV infection. (*Id.*). His assessment of patient functioning indicated that Plaintiff had no limitation in activities of daily living, no limitations in maintaining social functioning, and no limitations in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (R. 412).

In September 2011, Plaintiff had an X-ray taken of his right hip because of pain that had continued for approximately one month. (R. 474). The X-ray revealed no evidence of fracture or dislocation, with other aspects described as "normal" or "unremarkable." (*Id.*).

On October 11, 2011, Dr. Gilleon completed a second Medical Report, again confirming Plaintiff's HIV infection, and again checked boxes to indicate mycobacterial infection, syphilis and candidiasis. (R. 461). She also wrote that Plaintiff had neurological manifestations of his HIV infection, pneumonia, and hyperhidrosis. She omitted mention of diarrhea and added a notation of myalgia, reporting two to three episodes of one week each in a year. (R. 463). In a section for additional remarks, Dr. Gilleon wrote that Plaintiff experienced fatigue, hypersomnia, myalgia, arthritis, and secondary syphilis. (*Id.*).

Three days later, on October 14, 2011, Plaintiff saw Dr. Yeo at Thorek for a physical exam. He reported no complaints except fatigue, which Dr. Yeo identified as a possible medication side effect. Dr. Yeo recommended that Plaintiff discontinue his AZT and continue taking Atripla. (R. 472-473).

### 5. 2012

Plaintiff had four visits with Dr. Gilleon in January and February of 2012. On January 23, 2012, he reported anxiety about his partner's illness, and joint pain that Dr. Gilleon diagnosed as arthritis. (R. 523-524). A physical exam revealed tenderness in his shoulder but a normal range of motion and no edema. (*Id.*). Plaintiff's HIV was stable, and he exhibited no thrush at the time. (*Id.*). During a follow-up visit on February 3, 2012, Plaintiff reported joint pain and excess sleeping, but his gait was normal and he showed no abnormalities in his tongue, lips, or gums. (R. 526). Dr. Gilleon noted that Plaintiff's fatigue was accompanied by elevated levels of thyroid stimulating hormone, so she prescribed a trial of the thyroid replacement drug levothyroxine. (R. 525).

The following week, on February 10, Plaintiff visited Dr. Gilleon requesting a tuberculosis test ("PPD") for work. (R. 527). He also reported an incident of unprotected sex with someone other than his partner; the doctor prescribed azithromycin to be filled if Plaintiff experienced symptoms of infection. (*Id.*). Three days later, on February 13, Dr. Gilleon read Plaintiff's PPD as negative but noted that he was experiencing urethral discharge and had not yet filled his prescription for azithromycin. (R. 529).

Though he had been seeing Dr. Gilleon on a regular basis, Plaintiff went ten months without seeing his infectious disease doctors at Lakeshore despite their recommendation that he follow up every three months.  (R. 558).  When Plaintiff did return to Dr. Weinstein on March 22, 2012, he was "highly noncompliant" in his HIV treatment.  Dr. Weinstein wrote a note indicating "problem with insurance but never informed me—just discontinued meds."  (*Id*.).  During the examination, Plaintiff complained of pain in his wrists, back, knees, hips, and feet.  (*Id*.).  His gait was slow, his mood seemed depressed, and he reported that he was still caring for his partner who suffered from advanced HIV.  (*Id*.).

Plaintiff visited Dr. Gilleon, now at Midwest Family Wellness, on May 16, 2012.  At that visit, Dr. Gilleon reviewed his medication history, which showed that Plaintiff had been prescribed eight different medications in April and May: Vicodin, AZT, Atripla, the pain reliever tramadol, levothyroxine, Prozac, and lorazepam.  (R. 533, 537).  His Vicodin dosage had increased from 5 mg in April to 7.5 mg in May.  It is unclear from the record how many of these prescriptions Plaintiff actually filled.  That same day, Plaintiff spoke by phone with Dr. Weinstein at Lakeshore.  He told Dr. Weinstein that he lacked Medicare or Medicaid benefits and did not want to go to the CORE Center,[6] but would apply for AIDS Drug Assistance Program (ADAP) benefits and a discount program.  (R. 557).

---

[6]    The Ruth M. Rothstein CORE Center, part of the Cook County Health & Hospital System, is a "specialized out-patient health care facility addressing the medical and social needs of people with HIV/AIDS and other chronic infectious diseases." (http://www.cookcountyil.gov/core-center-ruth-m-rothstein/, last visited August 13, 2015).

The last available medical record is from Plaintiff's visit to Dr. Gilleon on August 27, 2012. He again complained of anxiety. (R. 536-538). She prescribed levothyroxine, Ambien for insomnia, as well as previous medications for pain and depression. (R. 536-537).

### 6. Report of Examining Consultant

On August 29, 2011 Plaintiff was interviewed by psychological examining consultant Kenneth M. Levitan, MD, who described his manner as "sad, lacking in energy, quietly anxious, and very angry" and his physical condition as "debilitated-like." (R. 413, 415). Plaintiff mentioned his depression and financial concerns, including a fear that he would become homeless. Dr. Levitan diagnosed Plaintiff as having depression NOS (not otherwise specified) secondary to his physical illnesses, and a nonspecific personality disorder. (R. 415). He opined that Plaintiff could perform simple and routine tasks, but would have difficulty handling regular work pressure and stress. (R. 416). He also stated that Plaintiff could communicate with his coworkers and supervisors and could follow and understand instructions, but could not be relied on to retain them. (*Id.*). He strongly recommended that Plaintiff seek counseling. (*Id.*). Dr. Levitan based his report on his in-person interview and did not review Plaintiff's past medical and psychiatric records (R. 413, 415-416).

### 7. Reports of Reviewing Consultants

On September 24, 2011, agency consultant Dr. Kenneth Lovko, MD prepared a Psychiatric Review Technique based on his review of Plaintiff's medical records from Lakeshore through May 18, 2011, the psychological assessment prepared by Dr. Levitan, and Function Reports prepared by Plaintiff and his friend. (R. 431, 443). Dr.

Lovko opined that Plaintiff had a mild limitation in activities of daily living; a moderate limitation in maintaining social functioning; a moderate limitation in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 441). The report also included a Mental Residual Functional Capacity Assessment, in which Dr. Lovko found that Plaintiff was not markedly limited in any area of functioning, and was moderately limited in the following five areas: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to interact appropriately with the general public. (R. 445). Dr. Lovko further found Plaintiff not significantly limited in any other area, including the ability to understand and remember short and simple instructions. (*Id.*). Dr. Lovko stated, "the evidence suggests that claimant can understand, remember, and carry-out unskilled tasks without special considerations in many work environments," but his "symptoms may present some impediment to work situations with large numbers of people." (R. 447).

On October 3, 2011, an agency medical consultant, George Andrews MD, completed a form entitled "Illinois Request for Medical Advice" and an assessment of Plaintiff's RFC based on a review of his medical records. Dr. Andrews concluded that Plaintiff's statements regarding his limitations in daily activities were only partially credible because they were more severe than what was shown in the medical evidence. (R. 449-451; 458). In his RFC assessment, Dr. Andrews opined that Plaintiff could

occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for about six hours in an eight-hour work day, and sit for about six hours in an eight-hour workday. He indicated no limitations in Plaintiff's ability to push or pull and no postural limitations. (R. 454-455).

## B.     Plaintiff's Testimony

### 1.     Plaintiff's Function Reports

In connection with his application for SSI, Plaintiff completed a Function Report on June 23, 2011. Plaintiff reported that, due to his disability, he can no longer stand for a long time or hold his bowels for a long time. He stated that taking his medication makes him sleepy and makes him go to the bathroom a lot, and he also indicated that he sweats a lot. (R. 176). He listed his medications as Atripla and AZT; two topical corticosteroids, betamethasone and fluocinolone; the antiviral drug valacyclovir; and Prozac. (R. 183). Plaintiff reported that on days he does not have a doctor's appointment, he spends most of his time sleeping or watching TV. Though he makes some of his own food two or three times a week, there are also days when he does not eat. (R. 177-178, 180). He reported being able to clean one room a day on days he is not tired, going out to doctors' appointments, and grocery shopping once a month. (R. 178-179). At the same time, he sometimes relies on his sister to comb his hair, to remind him to bathe, and to remind or help him to clean. (R. 177-178). Plaintiff prefers to be alone because he does not want people looking at him when he is sick, and he experiences fear in crowds. (R. 181-182). He reported that he has a hard time standing or walking for a long time, and can walk four blocks or 10-15 minutes before he needs to rest. (R. 181).

In a second Function Report completed on November 12, 2011, Plaintiff reported that he has arthritis and chronic diarrhea requiring him to be near a restroom. (R. 202). He stated that his sister cooks for him, helps him do his hair, and picks up his medications from CVS, and that his brother-in-law helps him shave. (R. 203-204). He indicated that his drowsiness sometimes causes him to slip in the tub, to forget to turn off the oven, and to forget to take his medicines. (R. 202, 204). He feels anxious in crowds. (R. 206-208). Plaintiff reported that his two HIV medications give him diarrhea and that his other medications—Prozac, tramadol, and Ambien—make him sleepy. (R. 209).

### 2. Plaintiff's Hearing Testimony

At the December 10, 2012 hearing before the ALJ, Plaintiff testified that he has been unable to work because of HIV, hyperhidrosis, arthritis, chronic pain, and chronic fatigue. (R. 44). Regarding his work history, Plaintiff stated, though he works part-time as a phlebotomist, he lost his prior job doing similar work due to illness after his patients complained about his hyperhidrosis. (R. 46, 48). He testified that he does not take his medications before work because they make him drowsy and "loopy." (R. 58). He sometimes has trouble concentrating at work but can "stop and catch [him]self" and think through what he has to do, sometimes pulling index cards out of the pocket of his lab coat to "take a refresher course" to avoid hurting his patients. (R. 61-62). He testified that he sees 10 to 15 patients in a three-hour shift, while his coworkers see 20 or 25, and that his employers allow him to see fewer patients because they know he is facing difficulties. (R. 62).

Plaintiff indicated that he lives alone and that his rent is partially subsidized through Section 8. (R. 50-51). He attested that, due to his fatigue after his three-hour shift, he goes to bed after work and sleeps through most of the day except to use the restroom or get a snack. (R. 57). He reported that he eats twice a day, cooking fast meals or eating leftovers, and that he cleans for himself on the weekends one room at a time with rest in between. He takes public transportation regularly and goes grocery shopping once a month. (R. 51-53, 58-59). He testified that he rarely goes out to eat or to the movies, both because of finances and because people "make fun" of the effects of his medications. He feels anxiety being around a lot of people. (R. 53, 59).

Plaintiff reported that he takes AZT and Atripla for HIV and experiences manifestations of HIV including thrush, pain, and diarrhea. (R. 53-55, 61). He testified that his thrush returns approximately once a month and impairs his ability to eat, swallow, and converse with patients at work, resolving in approximately three days if he is able to get or borrow medication for it. (R. 54). Plaintiff's diarrhea is "basically a constant thing," affecting him approximately five days a week, and is exacerbated by stopping and starting his medication. (R. 55). He has had accidents at work and wears protective undergarments daily "just in case." (R. 53, 55, 61).

Plaintiff testified that his arthritis causes pain, numbness, and "lock[ing] up" in his joints. (R. 45, 55-56). He testified that he has pain in his finger, ankle, and knee joints and that he has been taking tramadol for approximately one year, since his arthritis pain worsened. (R. 44-45). He also takes Vicodin, requiring 7.5 milligrams to have the pain subside completely. (R. 44-45). Plaintiff further testified that he has not seen a

specialist for his arthritis because he lost his medical insurance, and that he relies on Dr. Gilleon for treatment.  (R. 45, 50).

Plaintiff stated that his hyperhidrosis manifests itself daily in excessive sweating, and is triggered by movement and by anxiety.  (R. 47, 56-57).  He reported taking Prozac for depression since his HIV diagnosis in 1992, and lorazepam for anxiety. (R. 45, 50).  He stated that his depression causes him to cry for ten minutes two or three times a week.  (R. 56-57).  He noted that he was prescribed Ambien for sleep but said he rarely takes it because it makes him sleep too long.  (R. 47-49, 57).

Plaintiff testified that his application for state benefits was denied based on the Social Security Administration's determination that he was no longer disabled. (R. 48). He also testified that he lost his red, white, and blue card[7] and that his application for ADAP benefits was denied.  (R. 45-46).  He stated that, because his current insurance covers only 20% of the costs of his care, he has trouble paying for treatment and so fills his prescriptions less frequently and goes to the doctor less frequently than before.  (R. 44, 48-50).  He sometimes gets additional medication donated from friends.  (R. 45, 54). To stretch out his medications, he takes his HIV medications, tramadol, and Prozac approximately every three days instead of daily as prescribed, and he takes lorazepam about every other day instead of twice daily for the same reason.  He is able to take Vicodin more frequently because he can purchase a low-cost generic version at Walmart.  (R. 45, 48-49, 60).

---

[7]     A red, white, and blue Medicare card identifies its holder as an enrollee in Original Medicare. http://www.ehealthmedicare.com/about-medicare/your-medicare-card/.

**D.      Testimony of Vocational Expert**

Mr. Dunleavy testified at the hearing as a VE.  (R. 63-68, 99).  He characterized Plaintiff's past experience as a phlebotomist as light work at the lower end of semi-skilled.    (R. 64).    The ALJ described a hypothetical individual of Plaintiff's age, education, and vocational background who could perform light work as defined by 20 C.F.R. § 416.967, lifting up to 20 pounds occasionally and up to ten pounds frequently; but who would be limited to simple routine and repetitive tasks; who would need to be employed in a low stress job with only occasional changes in the work setting; and who could have only occasional contact with the public, coworkers, and supervisors.  (R. 64-65).  The VE testified that such an individual would not be able to perform Plaintiff's past work, but could perform other unskilled, light jobs available in the regional economy, including housekeeping cleaner (at least 30,000 jobs available in Illinois), cafeteria attendant (5,000 jobs), and assembler (20,000 jobs).  (R. 65-66).

The ALJ then posed a second hypothetical, describing an individual with the same limitations as in the first hypothetical, but further limiting that person to sedentary work, defined as lifting or carrying ten pounds, sitting approximately six hours in an eight-hour work day, and standing or walking approximately two hours in a six-hour workday.  The VE testified that such an individual would be able to perform a number of sedentary jobs available in the regional economy including assembler (2,000 jobs), sorter (1,000 jobs), and visual inspector (1,500 jobs).  (R. 66).

Finally, the ALJ posed a third hypothetical with the additional limitation that the person would need to have no contact with the public or coworkers and only occasional contact with supervisors.   The VE testified that, based on his experience, such a

limitation would be inconsistent with competitive employment. (R. 67). Plaintiff's attorney then asked whether the sedentary jobs available to a person meeting the second hypothetical would also allow for frequent breaks of five to ten minutes once per hour for someone suffering from symptoms of HIV. The VE opined that such a restriction would preclude any competitive employment, especially at the sedentary level. (R. 68).

E.    **Administrative Law Judge's Decision**

The ALJ found that Plaintiff's HIV infection, depression, arthritis, and anxiety are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24). After reviewing the evidence of record, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) in that Plaintiff can carry 20 pounds occasionally and ten pounds frequently, can stand and walk for six hours in an eight-hour workday, and can sit for six hours in an eight-hour workday. (R. 27). Plaintiff also needs to be limited to performing simple, routine, and repetitive tasks in a low stress job with only occasional changes in the work setting; and he can tolerate only occasional contact with the public, coworkers, and supervisors. (*Id.*).

In reaching this RFC determination, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not entirely credible," based in large part on Plaintiff's noncompliance with his prescribed treatment. (R. 28-29). The ALJ found that Plaintiff's noncompliance with HIV medications, combined with his failure to inform his physician of the noncompliance, suggested that Plaintiff's HIV symptoms are not so debilitating as to prevent him from

performing substantial gainful activity. Further, the ALJ concluded from Plaintiff's ability to pay out-of-pocket for some medication that he had not followed up on his physician's recommendation that he apply for ADAP. (R. 29). "In essence," the ALJ wrote, "the record did not contain evidence of much of an effort to obtain the treatment required to manage his impairments." As a result, the ALJ found that Plaintiff's stated reason for his noncompliance—an inability to afford treatment—was not credible. (*Id.*).

The ALJ also determined that Plaintiff was less than credible based in part on his activities of daily living and his part-time work as a phlebotomist. (R. 29). Specifically, he noted that Plaintiff cooks, cleans, takes public transportation, and goes to the grocery store, and that he is able to perform work of a "technical nature." (*Id.*) The ALJ also pointed out inconsistencies between some of Plaintiff's physical complaints and the medical record. For example, the record contains no evidence of physical abnormalities in the hip joint, no evidence of ongoing comorbid infections, and no significant complaints of chronic diarrhea. (R. 30). Finally, the ALJ also stressed the absence of statements from Plaintiff's treating physicians regarding his functional limitations as evidence that Plaintiff had no limitations more severe than those in the ALJ's RFC findings.

As for the opinion evidence, the ALJ noted that the reports from agency consultants Dr. Lovko and Dr. Andrews were consistent with his RFC findings. The ALJ acknowledged Dr. Levitan's contrary opinion that Plaintiff could not retain instructions, but he afforded it only some weight, reasoning that the opinion was based only on a single examination and was not consistent with Plaintiff's treatment history and semi-skilled work in the medical field.

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff is unable to perform any past relevant work. (R. 31) (citing 20 C.F.R. § 416.965). He also agreed that Plaintiff can still perform a significant number of light jobs available in the national economy, including housekeeper, cafeteria worker, and assembler. (R. 31-32). The ALJ also found, based on a follow-up hypothetical posed to the VE, that Plaintiff can perform a significant number of sedentary jobs such as assembler, sorter, or visual inspector. (*Id.*). For this reason, the ALJ concluded that Plaintiff is not disabled within the meaning of the Act and is not entitled to benefits.

## DISCUSSION

### A.  Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is

not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. 42 U.S.C. § 1382c(a)(3); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011). A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently engaged in substantial gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff claims that the ALJ's decision must be reversed because he (1) made a flawed credibility determination; and (2) failed to properly analyze the medical opinions.

### 1. Credibility Assessment

Plaintiff first objects to the ALJ's decision to discount his testimony. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms he reports are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). An ALJ's credibility determination must contain specific reasons for the credibility finding that are supported by evidence in the record. *Arnold,* 473 F.3d at 822. However, because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

The ALJ found that several of Plaintiff's claimed symptoms lacked medical support. Specifically, the ALJ noted that, despite Plaintiff's allegations of disability based on arthritis and complications from his HIV infection, his physical examinations were "unremarkable," evidencing a normal gait, full range of motion, normal breathing, no rashes, and normal neurologic function. (R. 30, citing notes from physical exams from March and July 2011, and January and February 2012.) He also noted that an examination of Plaintiff's shoulder showed full range of motion, an x-ray of his hip revealed no abnormalities, and the record did not show significant complaints of chronic

diarrhea as alleged by Plaintiff. (*Id.*). Additionally, he pointed to the fact that the record did not contain any opinions from treating physicians that Plaintiff is disabled or has significant limitations, despite Plaintiff's long relationship with his primary care physician. (*Id.*). Though inconsistency between a claimant's testimony and objective medical evidence is a proper factor to consider in assessing credibility, it is well-established that an ALJ "cannot rely solely on a conflict between objective medical evidence and a claimant's testimony as a basis for a negative credibility finding," *Schmidt v. Barnhart,* 395 F.3d 737, 746–47 (7th Cir. 2005). For this reason, the ALJ turned to other evidence in the record in order to assess the credibility of Plaintiff's statements.

The ALJ first stressed that Plaintiff was not compliant with treatment because he skipped doses of his medications instead of taking them as prescribed. (R. 28-29). Failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the noncompliance. SSR 96-7p. However, ALJs must not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." *Roddy v. Astrue,* 705 F.3d 631, 638 (7th Cir. 2013) (citations omitted). An inability to afford treatment is one reason that can "provide insight into the individual's credibility." SSR 96-7p; *Craft v. Astrue*, 539 F.3d at 679.

Here, Plaintiff's HIV has been treated with antiretroviral therapy since 1992. (R. 236). The available record, which runs from 2007 to 2012, shows that Plaintiff was consistently compliant with his medications until mid-2011. (*See* R. 262, 263, 270-271). Plaintiff testified that, since losing his Medicare coverage in 2011, he skips doses of his

medications in "order to stretch them out" because he cannot afford to buy them.  (R. 48-49).  The ALJ, however, dismissed this explanation because of what he characterized as an inadequate record of attempts to seek low- or no-cost treatment options.  (R. 29).

As the ALJ pointed out, Plaintiff expressed in a phone conversation with Dr. Weinstein that he did not want to go to the CORE Center.  (R. 29.)  However, the ALJ also stated that Plaintiff had not applied for ADAP benefits; this conclusion runs contrary to the record.  (*Id.*)  When he spoke to Dr. Weinstein about CORE, Plaintiff also stated that he intended to apply for ADAP and another discount program.  (R. 557).  He then twice testified at his hearing that his ADAP application had been denied.  (R. 45-46).  The ALJ failed to mention or consider this testimony in his analysis, concluding instead from Plaintiff's statements about paying for medication out-of-pocket that he had not applied for the ADAP program at all.  (R. 29).  Though a court is normally bound by an ALJ's credibility determination, this is not true "if the finding is based on errors in fact or logic," as has occurred here. *Allord v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006).

The Commissioner contends that, "even if the ALJ relied heavily on Warren's noncompliance, his other reasons for discounting Warren's credibility were valid, and the credibility analysis was otherwise adequately supported by the evidence." (Doc. 23, at 7).  By way of example, the Commissioner cites portions of the opinion that reference Plaintiff's activities of daily living and his part-time job.  (Doc. 23, at 7-8).

The ALJ did repeatedly state that Plaintiff cooks, cleans, goes to the grocery store, and takes public transportation.  (R. 26, 28-29).  Although it is certainly appropriate to consider an individual's activities of daily living in assessing his credibility,

the Seventh Circuit has repeatedly cautioned that this must be done with care. SSR 96-7p; *Roddy v. Astrue*, 705 F.3d at 639. This means that "[t]he ALJ cannot disregard a claimant's limitations in performing household activities." *Moss v. Astrue,* 555 F.3d 556, 562 (7th Cir. 2009) (citing *Craft*, 539 F.3d at 680; *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Circ. 2006)).

Testimony by Plaintiff and his friend indicates that Plaintiff cooks only very simple meals, and on days he does not cook, he either goes without eating or relies on his sister and friend to cook for him or bring him food. (R. 178, 185, 187, 202). It takes him an hour to clean one room, after which he must rest, and if he is tired he spreads the task of cleaning his four-room apartment over separate days. (R. 58-59, 177-178). He needs reminders and encouragement to bathe, shave, and do chores, and his sister helps him comb his hair. (R. 177-178, 186-189, 202-204). Plaintiff's primary hobby is watching TV, and he reports spending a great deal of time sleeping, (R. 57, 180, 189, 206, 286), which is consistent with his repeated complaints to his doctors about fatigue. (R. 272, 376, 472, 525-526). The ALJ failed to consider any of this evidence or explain his rationale for discounting it, as he was required to do. *See Pratt v. Colvin,* No. 12 C 8983, 2014 WL 1612857 at *8-10 (N.D. Ill. Apr. 16, 2014) (ALJ who noted that a claimant did "cook, clean, and do laundry" but did not consider her significant limitations in performing those activities failed to "build a logical bridge between the evidence and his conclusion that she was not credible.").

Along with the activities of daily living, the ALJ also highlighted Plaintiff's ability to work part-time in the technical profession of phlebotomist as "indicative of an ability to function." (R. 29). When evaluating a claimant's work experience as evidence of his

RFC, an ALJ must consider whether the work was done under special conditions or accommodations, including permission to "take frequent rest periods" or "work at a lower standard of productivity than other employees." 20 C.F.R. § 416.960(b)(1); 20 C.F.R. § 416.973(c). The Seventh Circuit has repeatedly stated that a person who is working may actually be disabled if the work is accommodated by a charitable or indulgent employer. *Voigt v. Colvin*, 781 F.3d 871, 876-877 (7th Cir. 2015) (citing *Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994)); *see also Henderson v. Barnhart*, 349 F.3d 434, 435-36 (7th Cir. 2003) ("the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation.").

Plaintiff testified that he sees approximately half as many patients as his colleagues do during a three-hour shift. (R. 62). He also indicated that he has trouble concentrating and sometimes needs to step aside, collect his thoughts, and review notecards he keeps in his lab coat as a "refresher course" to avoid harming patients— this despite the fact that phlebotomy has been his sole profession, in which he has worked on and off since 1991. (R. 56-57, 61-62, 168-171). Plaintiff testified that his employers accommodate his low productivity because they know he is going through difficulties. (R. 62).

Furthermore, both Plaintiff's testimony and his employment contract make it clear that his working hours are extremely limited. (R. 57, 146). As one of three employees sharing two part-time positions, Plaintiff works just two fifteen-hour weeks in succession, taking every third week off. (*Id.*). There is no conflicting evidence in the record on any of these points. Yet the ALJ acknowledged neither Plaintiff's extremely limited schedule

nor the apparent special accommodations he receives in concluding that his work activity demonstrates he is not disabled. *See Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) (claimant's ability to "work a few hours a week" for an employer who "tolerated frequent breaks… that an ordinary employer would have found unacceptable" did not contradict a claim of disability.)

It is entirely possible that, on remand, the ALJ will once again conclude that Plaintiff lacks credibility. But because multiple aspects of the ALJ's credibility determination were flawed, the ALJ failed to build "an accurate and logical bridge from the evidence to [his] conclusion that the claimant is not disabled*,"* and the case must be remanded for further consideration of these issues. *Simila v. Astrue*, 573 F.3d at 513 (internal quotations omitted); *see Eakin v. Astrue,* 432 Fed. App'x 607, 613 (7th Cir. 2011) (remanding where ALJ discredited Plaintiff's testimony due to several "troubling" determinations.)

## 2. Evaluations of Medical Opinions

Because the ALJ's flawed credibility assessment alone requires remand, this Court will not undertake a full analysis of Plaintiff's argument that the ALJ improperly weighted the opinions of the medical experts. However, the Court notes that the ALJ afforded only "some weight" to the opinion of the agency examining consultant Dr. Levitan while affording "great weight" to opinions of the non-examining consultants. (R. 30-31). Generally, an ALJ gives more weight to the opinion of a physician who has examined the claimant than to the opinion of reviewing consultants who have not examined the claimant. 20 C.F.R. §§ 416.927(c)(1). Nevertheless, an ALJ may discount the opinion of an examining physician as long as he explains his reasons for

doing so. *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record…").

Here, non-examining consultant Dr. Lovko opined that Plaintiff could "understand, remember, and carry out unskilled tasks." (R. 447). In contrast, after a consultative psychiatric exam of Plaintiff, Dr. Levitan stated that Plaintiff "could follow and understand instructions, but could not be relied on to retain them." (R. 416). The ALJ gave Dr. Levitan's opinion only "some weight," alleging that it "was not consistent with the claimant's treatment history, was based on a single examination," and was inconsistent with Plaintiff's part-time "semi-skilled work in the healthcare field." (R. 31). With respect to Plaintiff's work history, as discussed above, there is evidence that Plaintiff's performance at his part-time job is significantly impaired. Plaintiff testified that his productivity is about half that of his fellow employees, that he needs to take extra breaks, and that he occasionally consult notecards to remind himself of basic procedures. (R. R. 56-57, 61-62.) Therefore, the ALJ should take the opportunity afforded by this remand to clarify the consideration he gave to evidence regarding Plaintiff's job performance in weighting the opinions of the consultants.

## <u>CONCLUSION</u>

For the reasons stated above, the motion of Plaintiff is GRANTED, the motion of Defendant is DENIED, and the case is remanded for further proceedings consistent with this Opinion.

ENTER:

Dated: August 27, 2015

_____
SHEILA FINNEGAN
United States Magistrate Judge